# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA    )
                            )
v.                          )          CASE NO.: 8:24-CR-211-TDC
                            )
HOAU-YAN WANG,              )
                            )
        Defendant.          )

## DEFENDANT HOAU-YAN WANG'S
## MOTION TO SUPPRESS AND MEMORANDUM IN SUPPORT

Joanne Zimolzak (19342)
DYKEMA GOSSETT PLLC
1301 K Street NW
Suite 1100 West
Washington, D.C. 20005
(202) 906-8600
jzimolzak@dykema.com

Jennifer L. Beidel (*Pro Hac Vice*)
Mark Chutkow (*Pro Hac Vice*)
Timothy Caprez (*Pro Hac Vice*)
Emma Blackwood (*Pro Hac Vice*)
DYKEMA GOSSETT PLLC
39577 Woodward Avenue
Suite 300
Bloomfield Hills, MI 48304
(248) 203-0700
Email: jbeidel@dykema.com
mchutkow@dykema.com
tcaprez@dykema.com
eblackwood@dykema.com

*Counsel for Dr. Hoau-Yan Wang*

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS .................................................................................................. 2

   A.  Dr. Wang Conducts Neuroscience Work to Cure Alzheimer's Disease, Despite Health, Language, and Age Barriers. ........................................................................... 2

   B.  Just Five Days After the Citizen Petition, the FBI Conducted a Surprise, Late-Night Interrogation of Dr. Wang. ......................................................................................... 4

   C.  The FBI Obtains a Search Warrant Using Information from its Interrogation of Dr. Wang. ...................................................................................................................... 6

   D.  The Following Day, the FBI Continues Dr. Wang's Custodial Interrogation. .................... 7

ARGUMENT ...................................................................................................................... 10

   A.  The Fifth Amendment Protects Against Custodial Interrogations without *Miranda* Safeguards. .................................................................................................................. 10

   B.  Dr. Wang Was Subjected to Custodial Interrogations Without Miranda Warnings. ......... 11

     1.  Dr. Wang was Interrogated. ...................................................................................... 11

     2.  Dr. Wang's Interrogations were Custodial. ............................................................... 12

       a.  The Time, Place, and Purpose of the Encounters Support That They Were Custodial Interrogations. .................................................................................... 14

       b.  The Words, Tone of Voice, and General Demeanor of the Agents Supports That They Were Custodial Interrogations. ................................................................. 16

       c.  The Presence of Multiple Armed Officers Reinforces Their Custodial Interrogation. .......................................................................................................... 19

       d.  Dr. Wang's Age, National Origin, Language Skills, and Health Supports That There Was Custodial Interrogation. ......................................................................... 19

     3.  Dr. Wang Did Not Knowingly, Intelligently, and Voluntarily Waive his Miranda Rights. ....................................................................................................................... 21

     4.  Derivative Evidence Should be Suppressed as Fruits of the Poisonous Tree. ............... 22

   CONCLUSION ................................................................................................................. 24

## TABLE OF AUTHORITIES

*Arizona v. Mauro*,
   481 U.S. 520 (1987)................................................................................11

*Berkemer v. McCarty*,
   468 U.S. 420 (1984).............................................................................. 12

*Chavez v. Martinez*,
   538 U.S. 760 (2003).............................................................................. 10

*Davis v. Allsbrooks*,
   778 F.2d 168 (4th Cir. 1985) ............................................................... 21

*Fare v. Michael C.*,
   442 U.S. 707 (1979).............................................................................. 13

*J. D. B. v. North Carolina*,
   564 U.S. 261 (2011) ........................................................................ 13, 19

*Miranda v. Arizona*,
   384 U.S. 436 (1996)....................................................................... *passim*

*Murphy v. Holland*,
   845 F.2d 83 (4th Cir. 1988).................................................................11

*Oregon v. Elstad*,
   470 U.S. 298 (1985).............................................................................. 23

*Rhode Island v. Innis*,
   446 U.S. 291 (1980)..............................................................................11

*Stansbury v. California*,
   511 U.S. 318 (1994).............................................................................. 12

*Thompson v. Keohane*,
   516 U.S. 99 (1995) ............................................................................... 12

*United States v. Abdi Wali Dire*,
   680 F.3d 446 (4th Cir. 2012) ............................................................... 13

*United States v. Chen Song*,
   544 F. Supp. 3d 929 (N.D. Cal. 2021) .................................... 15, 18, 21, 22

*United States v. Churchill*,
   579 F. Supp. 3d 207 (D. Me. 2022) ..................................................... 17

*United States v. Colonna*,
   511 F.3d 431 (4th Cir. 2007) ...................................................... 12, 15, 20

*United States v. Craighead*,
   539 F.3d 1073 (9th Cir. 2008) .................................................... 14, 18, 20

*United States v. Day*,
   591 F.3d 679 (4th Cir. 2010) ...................................................... 13, 18, 19

*United States v. Elie*,
   111 F.3d 1135 (4th Cir. 1997) ........................................................................ 23

*United States v. Foster*,
   No. 21-4437, 2022 U.S. App. LEXIS 26240 (4th Cir. Sep. 20, 2022) .................... 10

*United States v. Freeman*,
   61 F. Supp. 3d 534 (E.D. Va. 2014) .................................................................. 12

*United States v. Hargrove*,
   625 F.3d 170 (4th Cir. 2010) ........................................................................... 12

*United States v. Hasan*,
   747 F. Supp. 2d 642 (E.D. Va. 2010) ................................................................ 13

*United States v. Hashime*,
   734 F.3d 278 (4th Cir. 2013) .................................................................. 12, 13, 15, 18

*United States v. Heredia-Fernandez*,
   756 F.2d 1412 (9th Cir. 1985) ..................................................................... 13, 20

*United States v. Juan*,
   No. 2:20-cr-00134, 2021 U.S. Dist. LEXIS 102891 (E.D. Cal. June 1, 2021) ....... 13, 14, 18, 20

*United States v. Karo*,
   468 U.S. 705 (1984) ................................................................................... 23, 24

*United States v. Knowles*,
   No. 2:15-875-RMG, 2016 U.S. Dist. LEXIS 163813 (D.S.C. Nov. 28, 2016) ......... 12, 15

*United States v. LeGette*,
   57 F.4th 406, 410 (4th Cir. 2023) ..................................................................... 12

*United States v. Patane*,
   542 U.S. 630 (2004) ........................................................................................ 22

*United States v. Perry*,
   560 F.3d 246 (4th Cir. 2009) ........................................................................... 13

*United States v. Riley*,
   920 F.3d 200 (4th Cir. 2019) ........................................................................... 10

*United States v. Taylor*,
   13 F.3d 786 (4th Cir. 1994) ........................................................................ 24, 25

*United States v. Washington*,
   431 U.S. 181 (1977) ....................................................................................... 10

*United States v. Weaver*,
   282 F.3d 302 (4th Cir. 2002) ....................................................................... 13, 19

*United States v. Wilson*,
   No. 21-cr-00360-LKG, 2023 U.S. Dist. LEXIS 117845 (D. Md. July 7, 2023) ....... 15, 19

*Wong Sun v. United States*,
   371 U.S. 471 (1963) ................................................................................... 22, 23

**Rules**

Fed. R. Crim. P. 12 ................................................................................................................... 2

## INTRODUCTION

On August 23, 2021 at approximately 9:00 p.m., two FBI agents knocked on the door of Defendant Dr. Hoau-Yan Wang ("Dr. Wang")'s modest row home in Philadelphia, Pennsylvania. When Dr. Wang opened the door, the agents - FBI Special Agent Jeffrey Weeks ("Agent Weeks") and his local partner (the "Second Agent") - showed their FBI credentials to Dr. Wang and entered the home, without specifically having been invited to enter. The agents took immediate control of the home, directing Dr. Wang and his wife to sit on the living room sofa. The agents then sat between Dr. Wang and the door and began a 90-minute interrogation of Dr. Wang about his work for Company 1, all without advising Dr. Wang of his constitutional rights. When Dr. Wang and his wife asked if they needed counsel for the interview, Agent Weeks ensured them not to worry, reassuring them that he just had a "few questions about Dr. Wang's research." These "few questions" did not cease until after 11 p.m.

Two weeks later, on September 9, 2021, both agents returned to Dr. Wang's home, at a time of the day when it was apparent that Dr. Wang's wife would be at her teaching job. The agents arrived with a search warrant, obtained the previous day, which was supported by a single affidavit by Agent Weeks. When the two agents entered the home, they left at least six other agents nearby in a concealed location, standing ready to conduct the search. The two agents again interrogated Dr. Wang about his work for Company 1, this time repeatedly accusing Dr. Wang of lying and again without advising him of his rights. In fact, it was only when Dr. Wang's wife arrived home from her job and insisted that Dr. Wang get a lawyer that Agent Weeks slammed his hand on the table and called in the concealed team to execute the search. The additional agents entered the home at around 5:15 p.m. and began systematically photographing and searching the home. Dr. Wang and his wife were directed to step into their backyard and stay there while the search was conducted. But, Agent Weeks did not stop there and eventually summoned Dr. Wang

back inside the home and resumed his attempts to question him, despite the clear and unequivocal request for counsel.

The police-dominated atmosphere of Dr. Wang's interrogations was custodial in nature. The agents' failure to afford Dr. Wang the warnings required by *Miranda v. Arizona* mandates that his statements and any evidence flowing therefrom, including all items provided by Dr. Wang at Agent Weeks' direction or seized pursuant to the search warrant, must be suppressed pursuant to Federal Rule of Criminal Procedure 12(b)(3)(C).

## STATEMENT OF FACTS

**A.    Dr. Wang Conducts Neuroscience Work to Cure Alzheimer's Disease, Despite Health, Language, and Age Barriers.**

Born and raised in Taiwan during an authoritarian regime, Dr. Wang immigrated to the United States in 1983 and became a naturalized U.S. citizen in 1993. *See* Exhibit A, Affidavit of Kim Eberle-Wang ("Mrs. Wang"), ¶ 2. Overcoming language barriers and autism spectrum disorder, Dr. Wang completed his Ph.D. in neuroscience in 1988, before becoming a research scientist in 1998 and joining the University 1[1] School of Medicine as a professor in 2001. *Id.* ¶ 3. Prior to the damaging repercussions from this Indictment, Dr. Wang had an unblemished career, achieving tenure at University 1 and earning multiple teaching and service awards. *Id.*; (*see also* Doc. 1 ¶ 1).

Dr. Wang, who is currently 67-years old, has suffered from deteriorating health for the past several years, including the time leading up to his encounters with the FBI in this matter. Exh. A ¶ 6. He suffers from kidney-related ailments for which he has undergone numerous treatments and procedures, including a surgery in July 2020 – a mere six weeks before the FBI interrogated

---

[1] The anonymized terms used in this motion are used in the same way as those in the Indictment.

him for the first time. *Id.* He has additionally suffered from various eye conditions through the years, having been monitored for cataracts at all times relevant here, developing an eye lesion and infection around the same time of the FBI visits to the home, and more recently being diagnosed with glaucoma for which he had multipole surgeries earlier this year. *Id.*

Notwithstanding such medical conditions and his deteriorating health, Dr. Wang continued to teach medical students and pursued his passion for supporting advances in research on novel treatments for Alzheimer's disease and other neurodegenerative diseases at University 1. *Id.* ¶ 4. Dr. Wang's passion for finding a cure for Alzheimer's disease is personal. His grandmother, father-in-law, and grandmother-in-law all suffer from Alzheimer's disease, putting Dr. Wang, his wife and three children at increased risk of developing the disease. *Id.* Over the past two decades, Dr. Wang has dedicated his research to developing drug treatments for Alzheimer's disease, including Drug A, a treatment being developed by Company 1, a publicly-traded biopharmaceutical company. *Id.*; (*see also* Doc. 1 ¶¶ 2-3).

Drug A has shown great promise in the treatment of Alzheimer's disease, and Company 1 has progressed well into a third phase of clinical trials for Drug A with continued oversight by the U.S. Food & Drug Administration ("FDA") and ongoing funding from the U.S. National Institutes of Health ("NIH"). Exh. A. ¶ 5.[2] The FDA and NIH's support continues unabated, despite those agencies' knowledge of the allegations that gave rise to the Indictment in this matter. *Id.*[3] Those

---

[2] *See also* [Company 1] Announces Completion of an Interim Safety Review of Oral [Drug A] On-going Phase 3 Trials (Sept. 24, 2024), available at https://www.cassavasciences.com/news-releases/news-release-details/cassava-sciences-announces-completion-interim-safety-review-0 (last visited Oct. 27, 2024).

[3] *See also* Response Letter from FDA CDER to Labaton Sucharow (Feb. 10, 2022), available at https://www.regulations.gov/docket/FDA-2021-P-0930/document (last visited Oct. 27, 2024); [Company 1] Announces Completion of an Interim Safety Review of Oral [Drug A] On-going Phase 3 Trials (Sept. 24, 2024), available at https://www.cassavasciences.com/news-

allegations are based on a Citizen Petition filed with the FDA on August 18, 2021, by a group of "short sellers" who sought to profit from driving Company 1's stock prices down by challenging the integrity of Company 1's clinical trials for Drug A.  *Id.*; *see also* Exh. B ¶ 19 n.1.  The short sellers' efforts were a stunning success:  Company 1's stock price plummeted in August of 2021, allowing the short sellers to make over $100 million on sales of Company 1 stock in that month alone.[4]

## B.    Just Five Days After the Citizen Petition, the FBI Conducted a Surprise, Late-Night Interrogation of Dr. Wang.

The short sellers were not the only party to rely on the Citizen Petition.  Just five days after it was filed, at approximately 9:00 PM, on Monday, August 23, 2021, the FBI paid a visit to Dr. Wang's home.  As Dr. Wang and Mrs. Wang were getting ready for bed, they were abruptly interrupted by loud banging sounds at their front door.  Exh. A ¶ 7.  Investigating the source of the noise, they observed a man peering into, and repeatedly striking, their window.  *Id.*  Upon noticing the Wangs, the man began waving in a manner that suggested familiarity.  *Id.*  Despite his confusion and the late hour, Dr. Wang opened the door, presuming the man was an acquaintance in need of help.  *Id.*  It was Agent Weeks and the Second Agent.  *Id.*

Agent Weeks introduced himself as an FBI agent from Washington D.C., identified his companion as a local FBI agent, and informed the Wangs that the agents needed to question Dr. Wang regarding his research on Drug A.  *Id.* ¶ 8.  The agents then maneuvered past the Wangs

---

releases/news-release-details/cassava-sciences-announces-completion-interim-safety-review-0 (last visited Oct. 27, 2024).

[4] Flanagan, Cristin, *Cassava Short Sellers Reap $100 Million in August Stock Rout*, Bloomberg IN(Aug. 31, 2021), https://www.bloomberg.com/news/articles/2021-08-31/cassava-short-sellers-reap-100-million-in-august-stock-rout (last visited Oct. 27, 2024).

into the home without waiting for an invitation to enter, then directed the Wangs to sit in the living room, placing themselves between the Wangs and the room's only exit. *Id. ¶¶* 7, 8.

The agents did not inform Dr. Wang of his rights to refuse participation in the interrogation, have an attorney present, deny the agents entry into his home, or terminate the interrogation and leave. *Id. ¶* 9. Nor did the agents offer any accommodations for Dr. Wang's advanced age, medical conditions, or language barrier, such as suggesting Dr. Wang could take a break, ask questions, or request an interpreter. *Id.* In fact, when Mrs. Wang asked Agent Weeks if Dr. Wang should have an attorney present, Agent Weeks assured her that the Wangs did not need an attorney, emphasizing that he only intended to ask Dr. Wang "a few questions" about his research. *Id. ¶* 10. Contrary to this representation, Agent Weeks and his partner interrogated Dr. Wang for nearly two hours, ending after 11 p.m. *Id. ¶* 11.

At the end of the first interrogation, Agent Weeks handed Dr. Wang a grand jury subpoena and told Dr. Wang that he could only avoid appearing in Washington, D.C. by sending all files requested in the subpoena to Agent Weeks. *Id. ¶* 13; Exhibit B, Search Warrant Affidavit, ¶ 6. Dr. Wang complied with the agents' demands because he and his wife believed he might be taken forcefully to Washington, D.C. if they did not. Exh. A *¶* 13. Driven by fear of arrest and imprisonment, Dr. Wang sent Agent Weeks "emails, spreadsheets, and other files" requested in the subpoena. *Id.*; Exh. B. ¶ 7.

As the agents were preparing to leave the Wang residence, Agent Weeks directed Dr. Wang not to tell *anyone* about the FBI's visit and interrogation of Dr. Wang, strongly implying this was because the FBI was investigating Company 1 (not Dr. Wang) and did not want Dr. Wang interfering with those efforts. Exh. A *¶* 12; *see also* Exhibit C, FBI 302 of August 23, 2021 Interview, at 4 ("WANG indicated that he intends to keep the existence of this subpoena and the

5

FBI's involvement confidential.").  Agent Weeks' instruction did not include a carveout for legal counsel, so Dr. Wang and Mrs. Wang reasonably believed they were not to engage legal counsel or inform legal counsel of Agent Weeks' visit.  Exh. A ¶ 12.  After the agents departed, Agent Weeks continued to press Dr. Wang to comply, calling him frequently and insisting that Dr. Wang continue to provide additional documentation while still maintaining the confidentiality Agent Weeks had insisted upon in the first interrogation.  *Id.* ¶ 14; Exh. B. ¶ 7 (describing conversations on August 24, 2021).

**C.     The FBI Obtains a Search Warrant Using Information from its Interrogation of Dr. Wang.**

On Wednesday, September 8, 2021, unbeknownst to the Wangs, the FBI obtained a search warrant for Dr. Wang's residence based, at least in part, on information and materials Dr. Wang provided in connection with the initial interrogation.  *See* Exh. B ¶¶ 22-27, 29-31 (describing information Dr. Wang provided Agent Weeks, including the types of research he had completed for Company 1, his knowledge of other laboratories' involvement in such testing, his procedures for saving such research and sending it to Company 1, and his views on specific research results); Exh. A ¶ 16.  The search warrant affidavit makes clear that the Government was investigating Dr. Wang, along with Company 1 and two of its officers, but at no time in his conversations with Dr. Wang or his wife did Agent Weeks warn Dr. Wang that he was under investigation.  Exh. B ¶ 3.  The warrant authorized the search of Dr. Wang's home for electronic devices and other records related to Dr. Wang's research for Company 1.

The sole bases for a search of Dr. Wang's home – as opposed to his laboratory at University 1 – were:  (1) Dr. Wang's August 23, 2021 statements from the first interrogation that while his original testing materials are at University 1 in New York, New York, he keeps certain of his data on removable storage devices and a personal computer that he keeps with him when he works from

home and that he has used Gmail accounts to transmit data; and (2) Dr. Wang's files provided to the Government at Agent Weeks' request that showed the Gmail transmission of certain materials and the document author of "wangfamily" in metadata.  *Id. ¶¶* 8, 25-27.

**D.    The Following Day, the FBI Continues Dr. Wang's Custodial Interrogation.**

On Thursday, September 9, 2021, at approximately 3:30 PM, when it was apparent that Mrs. Wang would be away from home teaching high school, Agent Weeks and the Second Agent returned to the Wang residence.  Exhibit D, FBI 302 of September 9, 2021 Interview, at 3 (noting Mrs. Wang's arrival); Exh. A ¶ 15.  Sometime later, when Mrs. Wang arrived home, she was shocked to find Dr. Wang in the dining room, with the agents sitting in chairs that effectively blocked Dr. Wang's exit from the room.  Exh. A ¶ 15; *see also* Exh. D at 3.  When Mrs. Wang asked the agents what was happening and why they were seated at her dining room table, Agent Weeks informed Mrs. Wang "that the interviewing Agents were there to gather additional facts and get to the bottom of the allegations in question."  Exh. D at 3; Exh. A ¶ 15.  The agents did not reveal that they were in possession of a search warrant and once again failed to advise Dr. Wang of his *Miranda* rights.  Exh. A ¶ 16.

During this encounter, Agent Weeks adopted a confrontational tone, admonishing Dr. Wang, "I told you not to talk to anyone about my visit" and "last time you told us one thing, but now you are saying something else."  *Id. ¶¶* 15, 17.  Agent Weeks continued his interrogation, accusing Dr. Wang of texting a Company 1 representative, inquiring about the frequency of his messages with Company 1, and repeatedly claiming Dr. Wang had "lied" about those communications.  *Id. ¶* 17; Exh. D at 3-4.  Dr. Wang clarified that his communications with Company 1 were solely related to scientific matters and the emotional impact he was suffering as a result of the Citizen Petition.  Exh. A ¶ 17; *see also* Exh. D, at 1 ("WANG is currently in communication with [Company 1] related to coordinating the analysis of plasma samples.").

7

Agent Weeks then said Dr. Wang had spoken over the phone with a Company 1 representative on numerous occasions since Agent Weeks' last visit and accused Dr. Wang of having informed the Company 1 representative of Weeks' presence for the first interrogation.  Exh. A ¶ 17.[5]  When Dr. Wang again denied having done so, Agent Weeks asked to see Dr. Wang's text messages with Company 1, plucking the phone from his hand, and proceeding to use his own cell phone to record himself looking through Dr. Wang's cell phone.  *Id.*  Notably, Agent Weeks did not audio or video record any other portions of the interrogation.

While Agent Weeks was reviewing Dr. Wang's cell phone, Mrs. Wang again asked if Dr. Wang should have legal representation, just as she had done during the first interrogation, indicating that the agents' answer from the first interrogation had been unclear to her.  *Id.* ¶ 18; *see also* Exh. D at 5.  As reflected in the video footage he took, Agent Weeks acknowledged the question about counsel, but said:  "This, however, me capturing this [the phone] is for the subpoena pursuant to what we already asked for."  Exh. D at 5; Exh. A ¶ 17.  The Second Agent added:  "I know it's difficult, I know [lawyers are] expensive, but if you do feel like you need one, you are certainly welcome to retain one."  Exh. D at 5; Exh. A ¶ 17.  Notably, though, as evidenced by the FBI 302 interview report, the agents did not stop interrogating Dr. Wang or provide *Miranda* warnings, even after Mrs. Wang inquired again about counsel.  Exh. D at 5-6; Exh. A ¶ 18.

As the interrogation continued, Mrs. Wang, increasingly alarmed and distressed by Agent Weeks' questioning and approach, interjected to remind Agent Weeks that English was not her husband's first language and that he was doing his best to articulate the complexities of his scientific methods to a non-scientist and to understand the legal concepts raised by Agent Weeks'

---

[5] Unbeknownst to Dr. Wang, Agent Weeks' concern over his alleged conversations with Company 1 was belied by the fact that the Government had already been in contact with Company 1's counsel about the investigation.  Exh. B ¶ 20.

questions, especially given the rapid-fire nature of the questioning.  *Id.* ¶ 18.  Agent Weeks responded in what Mrs. Wang perceived as a sarcastic tone designed to belittle Dr. Wang's national origin, with: "Oh, you weren't born in the U.S.?  We are soooo very lucky to have a prestigious scientist like you in our community."  *Id.*  It was at this point that Mrs. Wang said she wanted an attorney present for any further communications with the agents.  Exh. A ¶ 18.  Agent Weeks reacted with hostility, slamming his hands on the table, pointing at Dr. Wang, and shouting, "*HE* [Dr. Wang] has to say that!"  *Id.*  When Dr. Wang reiterated the request for an attorney that his wife had previously made, Agent Weeks resorted to a remonstrative display of authority:  he pulled out the search warrant from his pocket and, brandishing a walkie-talkie, asserted that a team of six to seven agents was stationed outside and prepared to enter the premises.  *Id.*; Exh. D at 6.  He then called in the team to execute the warrant.  Exh. A ¶ 18.

The Wangs eventually went into their backyard at the agents' direction, during which time Mrs. Wang first attempted to contact undersigned legal counsel.  *Id.* ¶ 19.  Mrs. Wang made the outreach, in part, because of her concern over Dr. Wang's mental state.  By this time, Dr. Wang had gone nearly mute from shock, having been reminded of his trauma from growing up in an authoritarian regime, which is further complicated by his autism spectrum disorder.  *Id.*

Eventually, Agent Weeks directed the Wangs to return inside the home and sat in a rocking chair that he placed uncomfortably close to the couch where he had instructed Dr. Wang to sit.  *Id.* ¶ 20.  Despite Dr. Wang's unequivocal request for an attorney earlier in the interrogation, Agent Weeks attempted to persist in questioning Dr. Wang, but Dr. Wang now refused to answer.  *Id.*

During the hours-long search of the home, at least six agents converged on the Wang residence, all visibly armed.  *Id.* ¶ 19.  The FBI confiscated at least twenty-three items, including

several computers, computer tablets, flash drives, notepads, scientific devices, notepads, CD-ROMs, and other various documents.  *Id.* ¶ 21; Exh. E.

The intimidating and aggressive conduct of Agent Weeks and his team, and the combative nature of certain of their questions, left the Wangs in a state of fear and distress.  After the agents departed, Dr. Wang admitted himself to the hospital due to the significant emotional trauma he suffered from these consecutive, highly coercive interrogations, resulting in a post-traumatic stress disorder diagnosis.  Exh. A ¶ 22.

## ARGUMENT

### A.    The Fifth Amendment Protects Against Custodial Interrogations without *Miranda* Safeguards.

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  The Fifth Amendment "proscribes self-incrimination that is compelled by official coercion[.]"  *See United States v. Foster*, No. 21-4437, 2022 U.S. App. LEXIS 26240, at *7 (4th Cir. Sep. 20, 2022) (citing *United States v. Washington*, 431 U.S. 181, 186-88 (1977)); *United States v. Riley*, 920 F.3d 200, 205 (4th Cir. 2019) ("[M]ere coercion does not violate the text of the Self—Incrimination Clause absent use of the compelled statements in a criminal case against the witness." (citing *Chavez v. Martinez*, 538 U.S. 760, 769 (2003))).  As such, "those subjected to coercive police interrogations have an automatic protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent criminal trial."  *Martinez*, 538 U.S. at 769 (parenthetical in original).

In *Miranda v. Arizona*, the Supreme Court adopted prophylactic procedural measures to guarantee that suspects are advised of their Fifth Amendment rights before custodial interrogations.  *Miranda v. Arizona*, 384 U.S. 436, 479 (1996) (holding a defendant "must be

warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires"). Thus, the "prosecution may not use statements. . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards" set forth in *Miranda*. *Id*. at 444. In order to use a statement that is the product of a custodial interrogation, the government must satisfy the burden of proving not only that *Miranda* warnings were given, but also that "the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Id*. at 475.

**B.    Dr. Wang Was Subjected to Custodial Interrogations Without Miranda Warnings.**

For the reasons set forth below, Dr. Wang was (1) interrogated; (2) in a custodial setting; (3) without *Miranda* warnings that would have enabled him to knowingly, intelligently, and voluntarily waive his rights. His statements should be suppressed.

### 1.    *Dr. Wang was Interrogated.*

Dr. Wang was interrogated by the FBI on August 23 and September 9, 2021. In *Rhode Island v. Innis*, the Supreme Court defined interrogation as "express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980) (clarifying that the "functional equivalent" of express questioning means "any words or actions on the part of the police" that the "police should know are reasonably likely to elicit an incriminating response from the suspect"); *Murphy v. Holland*, 845 F.2d 83, 86 (4th Cir. 1988) (quoting *Arizona v. Mauro*, 481 U.S. 520, 526-27 (1987)). On both visits to Dr. Wang's home, Agent Weeks expressly questioned Dr. Wang for hours about his work for Company 1, in a way that Agent Weeks recognized was likely to elicit an incriminating response from Dr. Wang. *See, e.g.*, Exh. B ¶ 3 ("The government is investigating

11

Hoau-Yan Wang . . . and others for, among other things, fraudulently inflating the value of the publicly traded securities of [Company 1].").  Dr. Wang was interrogated.

### 2.    *Dr. Wang's Interrogations were Custodial.*

Dr. Wang was in custody during his interrogations, as he was prevented from leaving his property or contacting an attorney.  In *Miranda*, the Supreme Court instructed that even where a suspect is not formally taken into police custody, the suspect may nevertheless be considered to be "in custody" if the suspect is "deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444.  The Fourth Circuit Court of Appeals has recognized that in-home interrogation can be custodial and can require *Miranda* warnings.  *See United States v. Colonna*, 511 F.3d 431 (4th Cir. 2007); *see also United States v. Hashime*, 734 F.3d 278, 285 (4th Cir. 2013) (suppressing statements given during in-home interrogation); *see also United States v. Knowles*, No. 2:15-875-RMG, 2016 U.S. Dist. LEXIS 163813 (D.S.C. Nov. 28, 2016); *United States v. Freeman*, 61 F. Supp. 3d 534 (E.D. Va. 2014).

"Two discrete inquiries are essential to the [custody] determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995); *United States v. LeGette*, 57 F.4th 406, 410 (4th Cir. 2023).  This determination is made by examining "all of the circumstances surrounding the interrogation" and determining "how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action.'"  *Stansbury v. California*, 511 U.S. 318, 322, 325 (1994) (per curiam) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)); *United States v. Hargrove*, 625 F.3d 170, 178 (4th Cir. 2010); *Keohane*, 516 U.S. at 112 (describing as "essential" to a custody determination the question of "would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave").

Several factors the Fourth Circuit considers in determining whether a reasonable person would believe they were in custody (known as the *Weaver* factors) include: "the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant." *United States v. Day*, 591 F.3d 679, 696 (4th Cir. 2010) (quoting *United States v. Weaver*, 282 F.3d 302, 312 (4th Cir. 2002), *cert. denied*, 537 U.S. 847 (2002)) (internal quotation marks omitted); *Hashime*, 734 F.3d 278, 283; *United States v. Perry*, 560 F.3d 246 (4th Cir. 2009) (citing *Weaver*, 282 F.3d at 312) (internal quotation marks omitted in original).  While the reasonable person inquiry does not consider the defendant's subjective mental state, it does take into account certain personal factors about the defendant, like the defendant's age, so long as those factors are known or objectively apparent to the officer who has taken the defendant into custody.  *J. D. B. v. North Carolina*, 564 U.S. 261, 293 (2011); *Fare v. Michael C.*, 442 U.S. 707 (1979).  As a result, courts have expressly considered factors such as language difficulties encountered by the defendant, citizenship, and experience with the American justice system in their totality of circumstances inquiries.  *See, e.g., United States v. Abdi Wali Dire*, 680 F.3d 446, 471 (4th Cir. 2012) ("expressing sympathy to the defendants' portrait of 'conditions in Somalia,' including a 'barely functional' government, a dearth of lawyers, and the absence of 'individual freedoms protecting persons who wish to refuse to answer questions from authorities'" (quoting *United States v. Hasan*, 747 F. Supp. 2d 642, 669 (E.D. Va. 2010))); *United States v. Heredia-Fernandez*, 756 F.2d 1412, 1415 (9th Cir. 1985) ("language difficulties may impair the ability of a person in custody" to waive their rights); *United States v. Juan*, No. 2:20-cr-00134, 2021 U.S. Dist. LEXIS 102891, at *18 (E.D. Cal. June 1, 2021) (noting the defendant's national origin in China – "a country where citizens customarily obey the

13

orders of police and other authorities" – as a factor suggesting custodial interrogation (quoting *United States v. Craighead*, 539 F.3d 1073, 1084 (9th Cir. 2008))).

In evaluating the totality of the circumstances surrounding Dr. Wang's interrogations, the *Weaver* factors suggest the interrogations were custodial, for the reasons set forth below.

### a.     The Time, Place, and Purpose of the Encounters Support That They Were Custodial Interrogations.

The first *Weaver* factor – the time, place, and purpose of the encounters – supports the interrogations were custodial. *Day*, 591 F.3d at 696. The first interrogation began late in the evening and, while the agents told Dr. Wang they just had a few questions about his research, the agents remained for 90 minutes, making it after 11 p.m. by the time they left. Exh. A. ¶¶ 7, 10, 11. The Wangs were dressed for bed when the agents arrived and were startled to hear the agents banging on their window late in the evening. *Id.* ¶ 7. Because the agents waved to the Wangs in a way that suggested familiarity, the Wangs opened the door. *Id.* The agents, who were armed, identified themselves as FBI agents and then entered the home without being expressly invited to do so. *Id.* Agent Weeks told the Wangs he had driven up from Washington, D.C. for the interview, which suggested to the Wangs there was no ability to reschedule. *Id.* Nor did the agents offer any alternate interview times once they saw the Wangs were dressed for bed. *Id.* Instead, they entered the Wangs' living room and sat on the sofa in a manner that blocked the Wangs' exit, creating a law-enforcement dominated atmosphere. *Id.* ¶ 8. Given that Mrs. Wang was there, a reasonable person in Dr. Wang's position would likely have felt uncomfortable leaving because that would have left his wife alone with armed agents. *See Juan*, 2021 U.S. Dist. LEXIS 102891, at *10-11 (noting that a reasonable person in the defendant's situation would be reluctant to leave their family members alone with agents).

During the first interrogation, Mrs. Wang, a U.S.-born citizen, had been far more assertive than Dr. Wang, interjecting with questions about whether they could have counsel present.  As a likely result, the agents began the second interrogation in the afternoon, when Dr. Wang's wife was teaching high school.  *Id.* ¶ 15; *see also*, *e.g*., *Colonna*, 511 F.3d 433 (considering the timing of the FBI's appearance at the defendant's residence as a factor supporting a finding of custodial interrogation); *Knowles*, 2016 U.S. Dist. LEXIS 163813, at *6 (noting that agents arrived at the defendant's home at 8:50 AM while he was "still dressed in sleeping attire," as a factor supporting a "custodial inquiry.").  Mrs. Wang's absence left Dr. Wang vulnerable and without guidance from his U.S.-born wife.

Both interrogations were orchestrated in a manner that isolated Dr. Wang in a room of his home, from which his exit was blocked by the agents.  Exh. A ¶¶ 8, 15.  In fact, if Dr. Wang had attempted to leave during the second interrogation, he would have found six armed agents waiting outside his home, reinforcing the idea that he was not free to leave.  *Id.* ¶¶ 18, 19.  Finally, the clear purpose of both encounters, as revealed in the search warrant affidavit, was to develop evidence against Dr. Wang, Company 1, and several of its officers.  Exh. B ¶ 3.

A person's home is the place where he or she typically finds refuge, and when that home is invaded by a police presence, the person's ability to retreat is markedly restricted.  *See United States v. Chen Song*, 544 F. Supp. 3d 929, 934 (N.D. Cal. 2021).  Dr. Wang's interrogations were custodial and meant to create a police-dominated environment in which a reasonable person would feel compelled to comply.  *See Hashime*, 734 F.3d at 284 ("the loss of control over their home by the suspect and his family" indicated the interrogation was custodial); *United States v. Wilson*, No. 21-cr-00360-LKG, 2023 U.S. Dist. LEXIS 117845, *13-14 (D. Md. July 7, 2023) (finding "a police-dominated atmosphere" when the "multiple [armed] officers" entered the home to search

15

"during the time that [the defendant] was interviewed by two agents in the living room of his home.").

### b.    The Words, Tone of Voice, and General Demeanor of the Agents Supports That They Were Custodial Interrogations.

The agents' words were both intimidating to Dr. Wang and designed to dissuade him from exercising his right to counsel or to terminate the interview.  Despite the clear purpose of the interrogations, which was to develop evidence against Dr. Wang and Company 1, Agent Weeks told Dr. Wang during the first interrogation not to worry because he only had "a few questions" about Dr. Wang's research.  Exh. A ¶ 10.  Agent Weeks ended the first interrogation with two "warnings," neither of which satisfy *Miranda* requirements:  (1) that Dr. Wang could be directed to Washington, D.C. if he did not comply with the grand jury subpoena; and (2) that Dr. Wang should tell <u>no one</u> about the agents having been there.  *Id.* ¶¶ 12, 13.  Agent Weeks could (and should) have said, "aside from your lawyer, tell no one," but he did not do so, making the Wangs fearful of contacting anyone, including a lawyer, about the matter.  *Id.* ¶ 12.  After the agents departed, Agent Weeks continued to pressure Dr. Wang, calling him frequently and insisting that Dr. Wang continue to provide additional documents and instructing Dr. Wang to maintain confidentiality.  *Id.* ¶ 14.

The second interrogation was even more tense.  Despite having a search warrant in his pocket and a team of agents sitting outside to execute it, when Mrs. Wang asked Agent Weeks asked why the agents were there, Agent Weeks said they "were there to gather additional facts and get to the bottom of the allegations in question," but did not mention the search warrant.  *Id.* ¶ 15.  Agent Weeks repeatedly accused Dr. Wang of lying, telling Dr. Wang, "I told you not to talk to anyone about my visit."  *Id.* ¶ 17.  After Dr. Wang replied with confusion and attempted to clarify, Agent Weeks repeatedly accused Dr. Wang of lying about his texts and phone calls with a

Company 1 representative.  *Id.*; Exh. D at 3-4.  When Dr. Wang again denied having done so, Agent Weeks asked to see Dr. Wang's text messages with Company 1 and then proceeded to use his own cell phone to record himself looking through Dr. Wang's cell phone.  *Id.* ¶ 17.  (Notwithstanding this cascade of accusations, it is noteworthy that Dr. Wang has not been charged with false statements to the FBI or obstruction of their investigation.)

When Mrs. Wang became alarmed and distressed by Agent Weeks' approach, she interjected to remind Agent Weeks that English was not Dr. Wang's first language and that Dr. Wang was doing his best to answer Agent Weeks' complicated questions.  *Id.* ¶ 18.  Agent Weeks did not stop questioning Dr. Wang or change his tactics, but instead responded in what Mrs. Wang perceived as a sarcastic tone with: "Oh, you weren't born in the U.S.?  We are soooo very lucky to have a prestigious scientist like you in our community."  *Id.*  An experienced agent like Agent Weeks undoubtedly knew Dr. Wang's citizenship status prior to entering his home, reinforcing Mrs. Wang's perception of the tone of the comment.

Sometime thereafter, Mrs. Wang again asked if Dr. Wang should have legal representation, just as she had done during the first interrogation, adding that the agents' answer from the first interrogation had been unclear to her.  *Id.*; *see also* Exh. D at 5.  Agent Weeks responded that his review of the cell phone was for the subpoena, which he implied did not require an attorney because it was an extension of the materials for which the Wangs had already been asked.  Exh. D. at 5; Exh. A ¶ 17.  Reinforcing the confusion, the Second Agent said:  "I know it's difficult, I know [lawyers are] expensive, but if you do feel like you need one, you are certainly welcome to retain one."  Exh. D. at 5; Exh. A ¶ 17.  This is exactly the type of confusing statement about the right to counsel that courts have found so convoluted as to result in a custodial interrogation.  *See, e.g., United States v. Churchill*, 579 F. Supp. 3d 207, 231-33 (D. Me. 2022) (holding that where

officers *Mirandized* the defendant, but then told the defendant that asking for a lawyer was "not practical" because the lawyer was "not going to be able to get [t]here today," the officers confused the defendant and his statements must be suppressed).

After still more interrogation, when Mrs. Wang said she wanted an attorney to be present for any further communications with the agents, Agent Weeks reacted with hostility, slamming his hands on the table, pointing at Dr. Wang, and shouting, "*HE* [Dr. Wang] has to say that!"  Exh. A ¶ 18.  When Dr. Wang (who was by now nearly non-verbal) repeated his own request for an attorney, echoing his wife's earlier statement, Agent Weeks resorted to a further display of authority:  he pulled out the search warrant and a walkie-talkie and said a team of six to seven agents was stationed outside, ready to enter the home.  *Id.*; Exh. D at 6.  He then called in the team to execute the warrant. Exh. A ¶ 18.

Taken together, the agents' words, tone, and demeanor during the interrogations show they were custodial, turning the Wangs' home into a "police-dominated atmosphere" and imposing "psychological restraints" on Dr. Wang to make him think he was required to comply.  *See Hashime*, 734 F.3d 278, 284 (citing *Craighead,* 539 F.3d at 1083 (concluding that when the interrogation transforms the home's otherwise comfortable and familiar setting into a "police-dominated atmosphere," *even if* a defendant is informed he is free to leave and being asked to give voluntary statements, the interrogation is custodial and the defendant's self-incriminating statements must be suppressed)); *see also Chen Song*, 544 F. Supp. 3d at 935 (suppressing custodial statements where the agents used "psychological restraints," like confronting the defendant with evidence of her "putative guilt," insisting she tell the truth, and implying that criminal charges could follow if she did not cooperate); *Day*, 591 F.3d at 696.  Dr. Wangs' statements were custodial.

### c.     The Presence of Multiple Armed Officers Reinforces Their <u>Custodial Interrogation.</u>

During the first and second interrogations, two armed officers were present in the Wangs' home, which courts have deemed sufficient to establish a "police-dominated atmosphere." *Juan*, 2021 U.S. Dist. LEXIS 102891, at *10, 20 (holding there is not "a floor for the number of agents required to create a police-dominated atmosphere," and finding a custodial interrogation by two armed officers who kept their weapons concealed); *see also Wilson*, 2023 U.S. Dist. LEXIS 117845, at *14 (Griggsby, J.) (considering that the two agents who interviewed the defendant in his home were armed in determining that the interrogation was custodial).  And, after the search warrant was executed, an additional six armed agents entered the Wangs' home.  The volume of armed agents further supports that there was custodial interrogation.  *Day*, 591 F.3d at 696 ("Among the facts to be considered are . . . 'the presence of multiple officers'" (quoting *Weaver*, 282 F.3d at 312)); *Wilson*, 2023 U.S. Dist. LEXIS 117845, at *13, 14 (finding custodial interrogation when "multiple" armed agents entered the [defendant's] home to conduct the search).[6]

### d.     Dr. Wangs' Age, National Origin, Language Skills, and Health <u>Supports That There Was Custodial Interrogation.</u>

While the focus is on whether a reasonable person would have found the interrogations custodial, courts have found that certain objective factors about a defendant that are known to the agents can be considered in the analysis.  Here, the agents knew many objective facts about Dr. Wang that put him at increased risk of being intimidated by their tactics.  <u>First</u>, Dr. Wang is 67-years old, an age at which many fall prey to schemes and obfuscation.  *See, e.g., J. D. B.,* 654 U.S.

---

[6] There was no physical contact between the agents and Dr. Wang, which is the only *Weaver* factor that is not implicated by Dr. Wang's interrogations.  *Day*, 591 F.3d at 696.

at 293 (discussing the age of the defendant as a factor in the custody inquiry).  <u>Second</u>, Dr. Wang grew up in authoritarian Taiwan, is a non-native English speaker, and had no previous interactions with the U.S. justice system, all of which made him less likely to push back on law enforcement authority.  *See Heredia-Fernandez*, 756 F.2d at 1415 (discussing language barriers as factors in the voluntariness of a statement); *see also Juan*, 2021 U.S. Dist. LEXIS 102891, at *18 (noting the defendant's national origin in China – "a country where citizens customarily obey the orders of police and other authorities" – as a factor suggesting custodial interrogation (quoting *Craighead*, 539 F.3d at 1084)).  Agents never offered Dr. Wang an interpreter, even when Mrs. Wang said he had particular difficulty with complex topics in English nor did anything else to reassure him that their tactics were not akin to those of authoritarian Taiwan.  Exh. A ¶ 18.

<u>Third</u>, Dr. Wang had recently had surgery and had numerous mental and physical health issues, about which Mrs. Wang told the agents.  *Id.* ¶ 6.  Despite this, the agents' tactics did not soften and, in fact, led Dr. Wang to require in-patient hospitalization for post-traumatic stress disorder after their departure.  *Id.* ¶ 22.  Taken together, the agents' actions in the face of Dr. Wang's apparent frailties strongly support that the interrogations were custodial.

* * *

In sum, a reasonable person in Dr. Wang's position would have found themselves powerless to do anything but cooperate with the agents' questions and directions.  The interrogations were custodial.  *See Colonna*, 511 F.3d 435-36 (finding coercive pressure indicative of custody where the interrogation took place in a police-dominated environment, and the agents took extensive measures to make any reasonable person believe that he was not free to leave).

### 3.     Dr. Wang Did Not Knowingly, Intelligently, and Voluntarily Waive his Miranda Rights.

Despite repeated questions from Dr. and Mrs. Wang about their rights to counsel, the agents *never* told Dr. Wang he was free to leave, that he had the right to remain silent, that he could terminate the interviews, or that he had the right to have counsel present at *either* interview.  Exh. A *¶¶* 9, 10, 17, 18; *see Davis v. Allsbrooks*, 778 F.2d 168, 171-72 (4th Cir. 1985) ("informing a suspect that he is not under arrest is one factor frequently considered to show lack of custody"); see also *Colonna*, 511 F.3d 431, 435 (explaining that the court found custody to exist despite agents informing Colonna that he was "not under arrest," because they did not also inform him that he was "free to leave").  Rather than *Mirandizing* Dr. Wang, Agent Weeks' behavior actively discouraged Dr. Wang from seeking the advice of counsel.  During the first interrogation, when Mrs. Wang asked about counsel, Agent Weeks said that was not necessary as he just had a few questions.  *Id.* ¶ 10.  Agent Weeks did not follow that with *Miranda* warnings, despite the Wangs' obvious confusion about their rights.  *See, e.g., Chen Song*, 544 F. Supp. 3d at 935 (suppressing custodial statements where the defendant said, "I need to know what kind of rights I have," but agents never *Mirandized* her).

And, at the end of that first interrogation, Agent Weeks told Dr. Wang to tell *no one* (presumably including counsel, given the Wangs' prior questions) of their conversation.  *Id.* ¶ 12. To make matters worse, Agent Weeks separately discussed the grand jury subpoena with Dr. Wang and implied that if Dr. Wang did not voluntarily provide certain files to him, Agent Weeks would drag him to Washington D.C.  *Id.* ¶ 13.  Taken together, a reasonable person in Dr. Wang's position would have believed they were not to talk to anyone, including a lawyer, or they would be hauled to court or worse.

In the second interrogation, the Wangs repeatedly asked about counsel, but the agents' responses were confusing, at best. *Id.* ¶ 17.  Agent Weeks suggested counsel was not necessary because he was still simply executing the grand jury subpoena work on which he had already started. *Id.*  The Second Agent acknowledged the right to counsel, but noted it was "difficult and expensive," in a presumed effort to dissuade the Wangs from taking that step. *Id.*  Following a request for counsel, Agent Weeks slammed the table and made an intimidating display of executing the search warrant, while still making a last-ditch effort to get Dr. Wang to talk by implying the options were talk (presumably without counsel) or have your home ransacked. *Id.* ¶ 18.

Even if the Court finds that the agents did partially inform Dr. Wang of his right to counsel (but not his other rights) deep into the second custodial interrogation, the damage had already been done and could not be cured by that late admonishment. *See, e.g., Chen Song*, 544 F. Supp. 3d at 931 (suppressing statements even though "forty-five minutes into the interview, the agents told [the defendant] several times that she was not under arrest and did not need to speak with them").  Dr. Wang did not knowingly, intelligently, or voluntarily waive his rights.

### 4.    *Derivative Evidence Should be Suppressed as Fruits of the Poisonous Tree.*

The "fruit of the poisonous tree" doctrine is an exclusionary rule that bars admission of derivative evidence that is either a direct or indirect product of the illegally obtained primary evidence. *Wong Sun v. United States*, 371 U.S. 471, 484 (1963) ("The exclusionary prohibition extends as well to the indirect as the direct products of such invasions.").  The Supreme Court has held that the exclusionary "fruit of the poisonous tree" doctrine does not apply to physical evidence obtained as a result of a defendant's *voluntary* statements obtained by law enforcement in violation of the prophylactic prescriptions set out in *Miranda* where there was no independent violation of the defendant's constitutional rights.  *See United States v. Patane*, 542 U.S. 630, 636 (2004)

("[T]he Miranda rule is a prophylactic employed to protect against violations of the Self-Incrimination Clause . . . [which] is not implicated by the admission into evidence of the physical fruit of a voluntary statement.").   But, where the tactics used by law enforcement to elicit information or evidence from a defendant rise to the level of a constitutional violation (for example, coercion), any evidence obtained, whether directly or indirectly, as a result of that violation must also be suppressed.  *See United States v. Elie*, 111 F.3d 1135, 1142-43 (4th Cir. 1997) ("the 'tainted fruits' analysis applies only when a defendant's constitutional rights have been infringed"); *Oregon v. Elstad*, 470 U.S. 298, 308 (1985) (noting under the *Wong Sun* doctrine "fruits of a constitutional violation must be suppressed") (emphasis omitted).   Additionally, evidence obtained pursuant to a search warrant is subject to the exclusionary rule if unlawfully obtained information was "critical to establishing probable cause for the issuance of the warrant." *United States v. Karo*, 468 U.S. 705, 719 (1984).

Based on the fruits of the poisonous tree doctrine, the Court should suppress the materials Dr. Wang provided after the first and during the second interrogation.  Dr. Wang provided materials to Agent Weeks after the first interrogation only because Agent Weeks said he would haul him to court in Washington, D.C. if he did not, a statement that would reasonably instill fear in anyone, let alone a person with Dr. Wang's background and frailties.  Exh. A ¶ 13.  What's more, Agent Weeks' actions dissuaded Dr. Wang from seeking legal counsel, who could have helped dispel that fear and explain Dr. Wang's Fifth Amendment rights against self-incrimination, including the Act of Production privilege that he could have used not to respond to the subpoena. Similarly, during the second interrogation, Agent Weeks repeatedly accused Dr. Wang of lying and then said he needed to look through Dr. Wang's cellphone if he were to believe Dr. Wang's story.  *Id.* ¶ 17.  A reasonable person would have found themselves compelled by Agent Weeks'

tactics to provide access to their phone – Dr. Wang's decision to provide the phone was not voluntary.

The search warrant materials should also be suppressed because the *only* statements in the search warrant affidavit suggesting Dr. Wang may have evidence relevant to a search in his home came from the first interrogation. *See* Exh. B ¶¶ 8, 25-27 (basing the search of Dr. Wang's home on: (1) Dr. Wang's August 23, 2021 statements from the first interrogation; and (2) Dr. Wang's files provided to the Government at Agent Weeks' request thereafter). Because the unlawfully obtained material from the first interrogation was critical to the probable cause underlying the search warrant, the search warrant materials should be suppressed. *Karo*, 468 U.S. at 719.

All evidence obtained from Dr. Wang, including the evidence provided by Dr. Wang at Agent Weeks' direction between the two custodial interrogations, the evidence on Dr. Wang's phone collected during the second interrogation, and the materials seized pursuant to the search warrant, are "fruits of the poisonous tree," acquired in violation of the Fifth Amendment. This evidence must be suppressed.

## CONCLUSION

Dr. Wang respectfully requests that the Court issue an Order, consistent with the proposed order accompanying this motion, suppressing all statements and information provided by Dr. Wang in response to the FBI's interrogations on August 23 and September 9, 2021, including documents Dr. Wang provided to the FBI between those interrogations and during the second interrogation and documents seized pursuant to the search warrant executed on September 9, 2021. In the alternative, Dr. Wang requests a hearing at which he can develop evidence regarding the custodial nature of the interrogations at issue.[7]

---

[7] To the extent the Government disputes any material facts put forth by Dr. Wang in this suppression motion, an evidentiary hearing is required. *See United States v. Taylor*, 13 F.3d 786,

Dated:  October 28, 2024

Respectfully submitted,

 /s/ Joanne Zimolzak
Joanne Zimolzak (19342)
DYKEMA GOSSETT PLLC
1301 K Street NW
Suite 1100 West
Washington, D.C. 20005
(202) 906-8600
jzimolzak@dykema.com

Jennifer L. Beidel (*Pro Hac Vice*)
Mark Chutkow (*Pro Hac Vice*)
Timothy Caprez (*Pro Hac Vice*)
Emma Blackwood (*Pro Hac Vice*)
DYKEMA GOSSETT PLLC
39577 Woodward Avenue
Suite 300
Bloomfield Hills, MI 48304
(248) 203-0700
Email: jbeidel@dykema.com
mchutkow@dykema.com
tcaprez@dykema.com
eblackwood@dykema.com

*Counsel for Dr. Hoau-Yan Wang*

---

789 (4th Cir. 1994). A hearing is required when the motion asserts facts that (1) are disputed and unresolvable on the record and (2) will affect the resolution of the constitutional claim.  *Id.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of October, 2024, I filed the foregoing Motion to Suppress and Memorandum in Support using the Court's CM/ECF system. The CM/ECF system sent a "Notice of Electronic Filing" to all counsel of record who have entered an appearance in this matter.

Dated: October 28, 2024                    Respectfully submitted,

                                           _/s/ Joanne Zimolzak_
                                           Joanne Zimolzak (19342)
                                           DYKEMA GOSSETT PLLC
                                           1301 K Street NW
                                           Suite 1100 West
                                           Washington, D.C. 20005
                                           (202) 906-8600
                                           jzimolzak@dykema.com