## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO: TDC-24-211** |
| **HOAU-YAN WANG,** | |
| **Defendant.** | |

## GOVERNMENT'S RESPONSE IN OPPOSITION TO
### DEFENDANT HOAU-YAN WANG'S MOTION TO SUPPRESS

## TABLE OF CONTENTS

FACTUAL BACKGROUND ...................................................................................................1

    The Charges ...............................................................................................................1

    The August 23, 2021 Voluntary Interview .................................................................2

    The Subsequent Voluntary Phone Interviews .............................................................3

    The September 9, 2021 Voluntary Interview ...............................................................4

LEGAL FRAMEWORK ......................................................................................................6

    I.  *Miranda* Warnings Are Required Only For Custodial Interrogations.........................6

    II.  Voluntary Statements are Admissible Under the Due Process Clause ............................7

ARGUMENT .......................................................................................................................7

    I.  The Defendant Was Not In Custody ...........................................................................8

    August 23, 2021 Voluntary Interview .........................................................................8

    September 9, 2021 Voluntary Interview ....................................................................10

    II.  An Evidentiary Hearing is Not Required ...................................................................12

    III.  The Search Warrant Was Independently Sourced ......................................................16

CONCLUSION ..................................................................................................................17

CERTIFICATE OF SERVICE ...........................................................................................18

# TABLE OF AUTHORITIES

**Cases**

*Berkemer v. McCarty*,
    468 U.S. 420 (1984) ............................................................................................. 6

*Davis v. Allsbrooks*,
    778 F.2d 168 (4th Cir. 1985) ............................................................................... 9

*Thompson v. Keohane*,
    516 U.S. 99 (1995) ............................................................................................... 6

*United States v. Azua-Rinconada*,
    914 F.3d 319 (4th Cir. 2019) ............................................................................. 14

*United States v. Colonna*,
    511 F.3d 431 (4th Cir. 2007) ............................................................................. 15

*United States v. Cristobal*,
    293 F.3d 134 (4th Cir. 2002) ............................................................................... 7

*United States v. Culotta*,
    413 F.2d 1343 (2d Cir. 1969) ............................................................................ 13

*United States v. Griffin*,
    811 F. App'x 815 (4th Cir. 2020) ...................................................................... 12

*United States v. Hargrove*,
    625 F.3d 170 (4th Cir. 2010) ......................................................... 6, 8, 9, 10, 17

*United States v. Hashime*,
    734 F.3d 278 (4th Cir. 2013) ................................................................. 6, 11, 14

*United States v. Holmes*,
    670 F.3d 586 (4th Cir. 2012) ............................................................................ 11

*United States v. Johnson*,
    400 F.3d 187 (4th Cir. 2005) ............................................................................ 13

*United States v. Leggette*,
    57 F.4th 406 (4th Cir. 2023) ............................................................................... 9

*United States v. Mandujano*,
    425 U.S. 564 (1976) .......................................................................................... 10

*United States v. Nielsen*,
    640 F. App'x 224 (4th Cir. 2016) ................................................................. 7, 10, 14

*United States v. Robinson*,
    153 F. Supp. 2d 188 (E.D.N.Y. 2001) ....................................................... 12

*United States v. Song*,
    544 F. Supp. 3d 929 (N.D. Cal. 2021) ...................................................... 15

*United States v. Stinson*,
    No. 17-cr-211, 2018 WL 2172510 (E.D. Va. May 9, 2018) .................... 12

*United States v. Tang Juan*,
    No. 2:20-CR-00134, 2021 WL 2212235 (E.D. Cal. June 1, 2021) .......... 15

*United States v. Wilson*,
    No. 21-CR-00360-LKG, 2023 WL 4421572 (D. Md. July 7, 2023) ........ 15

**Rule**

Fed. R. Crim. P. 12(c) .............................................................................. 12

The United States, through undersigned counsel, respectfully submits this response in opposition to the Defendant's Motion to Suppress, ECF No. 49, which seeks to suppress statements and evidence obtained during an August 23, 2021 interview at the Defendant's residence and, later, a September 9, 2021 search executed there. As detailed below, the Defendant was not in custody during either encounter when he gave voluntary interviews to law enforcement and, thus, *Miranda* warnings were not required. Moreover, no evidentiary hearing is necessary because even assuming as true each of the facts alleged in the Defendant's motion, the circumstances still did not rise to legal custody. Finally, the duly authorized search warrant that he challenges was based upon information that was independent of the August 23, 2021 interview and, accordingly, even a prior custodial encounter would not invalidate the legal search. In light of these facts, government respectfully submits that the motion should be denied.

## FACTUAL BACKGROUND

### The Charges

On June 27, 2024, the Defendant was charged in a scheme to defraud the U.S. National Institutes of Health ("NIH") of approximately $16 million in federal grant funds. ECF No. 1. The indictment alleges that the Defendant, a tenured professor at University 1, fabricated and falsified scientific data in grant applications made to the NIH on behalf of himself and a Texas biopharmaceutical company, Company 1, for whom he served as a paid advisor and consultant. As alleged, the fraudulent grant applications to the NIH sought funding for scientific research of a potential drug treatment and diagnostic test for Alzheimer's disease and resulted in millions of dollars in grants from approximately 2017 to 2021, part of which funded the Defendant's laboratory work and salary.

The Defendant, who was born in Taiwan but settled in the United States and became a citizen in 1983, has taught medicine at University 1 in New York for over 20 years, obtained two

advanced degrees here, and published on scientific topics extensively, in English.  The Defendant sat for several depositions with the U.S. Securities and Exchange Commission and an interview with University 1 on topics related to the conduct charged in the indictment, during which he was represented by his current counsel in this case, who was present.  The Defendant did not have an interpreter in any of those settings.  At his initial appearance in this case, the Defendant confirmed that he spoke English and had no language barrier.  ECF No. 14.

As part of its investigation, the FBI interviewed a number of individuals—including the Defendant—in relation to the alleged scheme.  All of the Defendant's interviews with the FBI were voluntary and non-custodial, and thus the statements and other evidence that resulted from these encounters were constitutionally obtained, as further described below.

**The August 23, 2021 Voluntary Interview**

On the evening of August 23, 2021, FBI Special Agent Jeffrey Weeks, together with FBI Special Agent Kelsie Judd, approached the Defendant's residence for a voluntary interview.  *See* ECF No. 49, Ex. C (Aug. 23, 2021 Wang FBI 302).  Both agents were dressed in plain clothes, and their weapons were holstered and concealed.  They knocked on the front door and waited, and when the Defendant answered, the agents introduced themselves and showed their credentials. After the agents explained that the purpose of their visit was to interview the Defendant regarding his work for Company 1, the Defendant and his wife allowed them inside.

The front door led directly into an open living room and, once there, everyone sat down where they wanted.  The Defendant's wife remained next to him and engaged in the conversation with the agents; nobody asked her to leave the room.  The living room had two different exits— one of which was the front door—that were free and clear during the entirety of the interview.  The agents were professional and courteous throughout, politely asking questions about the

Defendant's scientific work and background.  During the interview, the Defendant—who has lived in the United States for over 40 years and has taught medicine in English at University 1 for over 20 years—appeared to understand the agents' questions and responded accordingly.  Nobody requested an interpreter or asked to stop the discussion at any time.  On several occasions, the Defendant pushed back on the agent's questions, including by denying that he ever manipulated scientific data, demonstrating that he was not overborne by the circumstances of the interview; he made no facially self-incriminating statements during this interview.  *See id.*  As the interview was ending, Special Agent Weeks provided the Defendant with a grand jury subpoena, explaining that the Defendant would not have to appear in the District of Columbia to deliver the requested documents in person if he could produce them otherwise.  The agents then made a standard request by asking the Defendant to keep their conversation confidential since there was ongoing investigation.  There was never a request for counsel.  The Defendant was not arrested.

During the August 23, 2021 voluntary interview, the agents did not ask—and the Defendant did not make statements—about any electronic devices that he used in the course of his scientific work.  Starting the next day, the Defendant emailed certain materials responsive to the grand jury subpoena to Special Agent Weeks using a Gmail account.

**The Subsequent Voluntary Phone Interviews**

A fact not included in the Defendant's motion, following the August 23, 2021 interview at his house, the Defendant and Special Agent Weeks spoke over the phone seven times before the subsequent search of the Defendant's residence on September 9, 2021.  On at least one of these occasions, it was the Defendant who reached out to Special Agent Weeks to provide follow-up information.  None of these telephonic conversations—which spanned August 24, 2021 to September 1, 2021—were custodial, and all of them were voluntary.  In some of them, the

Defendant's wife was again present with him as he spoke.  To the extent that the probable cause presented in Special Agent Weeks' affidavit in support of the search warrant was based upon statements made by the Defendant about his collection and storage of scientific data at his home, it was sourced from these telephonic conversations, which were summarized and tied back to the dates of the calls with specificity.  *See, e.g.*, ECF No. 49, Ex. B (Weeks Affidavit), at ¶ 30 (referring to an August 24, 2021 phone call in which the Defendant described the manner in which he adjusted certain images of his scientific testing and explained that he used Gmail to correspond with Company 1); ¶¶ 8, 31 (referring to an August 26, 2021 phone call in which the Defendant described the location of certain relevant testing materials); ¶ 8 (referring to an August 30, 2021 phone call in which the Defendant explained the viability of certain relevant testing materials for inspection); ¶¶ 22, 25 (referring to an August 31, 2021 phone call in which the Defendant acknowledged his involvement in certain testing of Drug A, the use of electronic devices to process and collect relevant data, and his ability to work from home); ¶ 8 (referring to a September 1, 2021 phone call in which the Defendant declined to show law enforcement certain testing materials and described the use of his laptop, which he said he kept with him).

To be clear, it was in these telephonic conversations that the Defendant for the first time described the electronic devices that he used in the course of his work to collect scientific data. *See, e.g.*, *id.* at ¶ 25 (referring to an August 31, 2021 phone call in which the Defendant described his use of a removable storage device to transfer testing data from his laboratory onto a personal computer).

**The September 9, 2021 Voluntary Interview**

Based upon facts gathered following the August 23, 2021 interview, the government obtained a duly authorized warrant to search the Defendant's residence, including specifically for

4

computers and storage media. On September 9, 2021, Special Agent Weeks and Special Agent Judd returned to the Defendant's house to continue speaking with him and to collect relevant evidence. *See* ECF No. 49, Ex. D (Sept. 9, 2021 Wang FBI 302). They sat and talked this time around a table in the Defendant's dining room, which again had two unobstructed exits; the two agents again were dressed in plain clothes with no visible weapons, and the Defendant's wife participated shortly after their arrival when she returned home from work.

During an earlier phone call on August 30, 2021, the Defendant told Special Agent Weeks that he had not spoken with Company 1 about this matter and had only a brief conversation with his primary contact there. Because Special Agent Weeks had contrary information based upon duly obtained cell-phone tolls, he asked the Defendant why he had lied. The questions were pointed, but they were not "hostile" or "sarcastic." ECF No. 49, at 14. During that conversation, Special Agent Weeks asked if he could look at the Defendant's text messages with the contact at Company 1. The Defendant consented and gave the agent his phone, and the agent then scrolled through the relevant communications and captured them on video. The Defendant's wife left the dining room for part of the interview. Following this exchange, the Defendant's wife returned to the room and stated, for the first time, that she wanted counsel present. After the Defendant confirmed, all questioning by the agents stopped immediately. Additional agents who were not in view at any point during the voluntary interview and had been staged at a nearby location were then called in to collect the evidence authorized by the search warrant. Once the search was completed, Special Agent Weeks approached the Defendant one last time only to provide him with a copy of the search warrant, a receipt for property, and an explanation about what was taken, consistent with standard FBI practice and the legal requirements of the warrant; there was no additional questioning. The Defendant was not arrested.

## LEGAL FRAMEWORK

### I.   *Miranda* Warnings Are Required Only For Custodial Interrogations

     *Miranda* warnings are required only when there is custodial interrogation.  *United States v. Hargrove*, 625 F.3d 170, 178 (4th Cir. 2010).  A person is "in custody," despite the lack of a formal arrest if, under the totality of the circumstances, the individual's "freedom of action is curtailed to a degree associated with formal arrest."  *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)) (internal quotation marks omitted).  The question of custody is based upon whether, "viewed objectively, a reasonable man in the suspect's position would have understood his situation to be one of custody."  *Hargrove*, 625 F.3d at 178 (quoting *Berkemer*, 468 U.S. at 440) (internal quotation marks omitted).  In other words, the inquiry is whether a reasonable person would have felt that he was "not at liberty to terminate the interrogation and leave."  *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).  In "conducting this inquiry it is important to remember that [a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, . . . but only when there is a custodial interrogation is it necessary for the police to provide the suspect with *Miranda* warnings."  *Hargrove*, 625 F.3d at 178 (internal quotation marks omitted).

     Neither the subjective views of law enforcement conducting the questioning, nor the person being questioned, dictate the custody analysis; rather, the analysis depends upon the "objective circumstances of the interrogation."  *Id.* at 181.  Under the objective custodial inquiry, relevant facts can include "the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant," the individual's "isolation and separation from family," and "physical restrictions."  *United States v. Hashime*, 734 F.3d 278, 283 (4th Cir. 2013).

II.    __Voluntary Statements are Admissible Under the Due Process Clause__

Where *Miranda* does not attach, a person's statements are admissible unless they are involuntary under the Fifth Amendment's Due Process Clause.  This analysis is the same as the *Miranda* waiver's voluntariness inquiry.  *United States v. Cristobal*, 293 F.3d 134, 140 (4th Cir. 2002).  Thus, the question is whether under the totality of the circumstances, including the "characteristics of the defendant, the setting of the interview, and the details of the interrogation," an individual's "will has been overborne or his capacity for self-determination critically impaired because of coercive police conduct," with coercive police conduct being a "necessary predicate." *United States v. Nielsen*, 640 F. App'x 224, 228-29 (4th Cir. 2016).

## ARGUMENT

The Defendant does not argue that his interviews were involuntary, only that law enforcement was required to provide *Miranda* warnings before interviewing him.  But *Miranda* attaches only if the accused is "in custody," which was not the case here.

The Defendant provided a voluntary interview on August 23, 2021 in a non-custodial setting in his own home during which *Miranda* warnings were not required.  The objective circumstances show that the Defendant and two agents engaged in a calm discussion, following which the Defendant continued the conversation with Special Agent Weeks seven more times, including at least once when the Defendant reached out to Special Agent Weeks of his own accord. The totality of the circumstances, including the environment of the interview and the demeanor of the agents, establish that the Defendant was not "in custody" for purposes of *Miranda*.  Even assuming that he was, the statements that the Defendant made during the August 23, 2021

interview were not the basis for the search-warrant affidavit, which principally relied upon the later non-custodial phone calls and other evidence.

Nor was the September 9, 2021 encounter custodial. The Defendant just before had engaged in a series of phone calls with the agent in which they had developed rapport, so that the day of the search reflected a continuing conversation with familiar agents. Once the Defendant asked for counsel, all questioning stopped, and additional agents only then entered the premises to complete the search. Regardless, a custodial interview during the search would not invalidate the duly authorized search warrant and, thus, the electronic devices and other materials collected in the search were constitutionally obtained.

Finally, even assuming as true each of the facts alleged in the Defendant's motion, those circumstances did not rise to legal custody. Prevailing case law dictates that the scenario alleged by the Defendant, even viewed in the light most favorable to him, did not create an environment where *Miranda* attached. Accordingly, no evidentiary hearing is required.

### I.   <u>The Defendant Was Not In Custody</u>

*August 23, 2021 Voluntary Interview*

The objective circumstances show that the August 23, 2021 interview was non-custodial. To start, the environment of the interview was in the Defendant's own residence, rather than, for example, a police car or police station. This indicates a setting that is not akin to formal arrest. *See Hargrove*, 625 F.3d at 180 ("[A]n interview at a suspect's residence tends to be more neutral than one that occurs at a law enforcement facility. A more relaxed environment usually indicates less formal police control over the location or the defendant, and thus suggests a setting that is not of the degree typically associated with a formal arrest."). Moreover, while informing a suspect that he is not under arrest is one factor frequently considered to show lack of custody, "it is not a

talismanic factor." *Davis v. Allsbrooks*, 778 F.2d 168, 171-72 (4th Cir. 1985).  Where, as here, the entire context indicated a lack of custody, failure to inform the Defendant of his status is not dispositive.  *Id.*; *see United States v. Leggette*, 57 F.4th 406, 411-12 (4th Cir. 2023) (recognizing that even if the defendant was not free to leave, "we must still ask the additional question of whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*" (internal quotation marks and alteration omitted).

During the interview, there was no show of force that rendered the Defendant's freedom of action curtailed: only two officers were present in the room; no weapons were displayed; and the tone of the agents' questioning was professional and conversational.  *See Hargrove*, 625 F.3d at 179-80, 182 (holding that the defendant was not "in custody" because the defendant was not handcuffed, no weapons were drawn during the interview, and the conversation was "amicable and non-threatening in tone"); *see also id.* ("The mere presence of armed law enforcement officers during the interview is not sufficient to create a custodial situation.").  Moreover, the Defendant was not separated from his family, with his wife next to him participating in the conversation during its entirety.  As an adult fully capable of communicating consent, the Defendant continued the conversation and never asked to stop.  And as further evidence that he was not overborne, he gave untruthful statements to the agents.  For example, the Defendant claimed that he never amended any of the scientific data that he generated, which was in fact false.

In addition, no coercion attached to the agent's service of a lawful grand jury subpoena, which provided on its face that while the government preferred that he not disclose the subpoena to others, there was no legal prohibition on him doing exactly that.  The Defendant contends, without any legal authority, that the materials he produced to the FBI pursuant to the subpoena and the communications that took place in connection with his response were somehow made under

duress.  *See* ECF No. 49, at 23.  But the Supreme Court has recognized that grand jury investigations take place in a whole different setting from custodial police interrogation: "[u]nder *Miranda*, a person in police custody has, of course, an absolute right to decline to answer any question, incriminating or innocuous, whereas a grand jury witness, on the contrary, has an absolute duty to answer all questions, subject only to a valid Fifth Amendment claim." *United States v. Mandujano*, 425 U.S. 564, 580-81 (1976).  Nothing about the service of compulsory process at the conclusion of the interview transformed an otherwise non-custodial encounter into one requiring *Miranda* warnings.

In *United States v. Nielsen*, 640 F. App'x 224, 227-28 (4th Cir. 2016), the defendant was questioned at his residence, outside, while agents searched his home.  The defendant was "separated from his family," and the interview lasted three hours, with questioning becoming "more aggressive" at times.  *Id.* at 228.  Nevertheless, the district court found, and the Court of Appeals upheld, that the defendant was not "in custody."  *Id.*  Countervailing circumstances included the small number of agents at the residence (five to six, with up to three interviewing the defendant at a time), a lack of physical restraints on the defendant's movement, and the "generally empathetic tone" of the interview.  *Id.* at 227-28.  As with *Nielsen*, the Defendant here was not "in custody" "simply because he was approached by law enforcement for questioning about the allegations made against him."  *Id.* at 228.

### September 9, 2021 Voluntary Interview

As was the case in *Hargrove*, while more law-enforcement agents were involved in the subsequent search-warrant execution, only two officers conducted the interview.  *See id.* at 179.  Although the agents here were armed, their firearms were never displayed to the Defendant, and the Defendant was free to move about his home.  All of these facts compel the conclusion that the

September 9, 2021 interview was also non-custodial and, accordingly, any statements made by the Defendant during the search were constitutionally obtained.

To be sure, the interview was conducted mid-afternoon in an open space of the Defendant's home, where he was easily able to navigate or leave; it did not occur in a small or obstructed space. And the conversation followed multiple phone calls with Special Agent Weeks that the Defendant does not allege were threatening or hostile, and some of which the Defendant himself initiated. Simply put, the Defendant understood precisely what the agents' areas of focus was and was willing to continue speaking with them. The agents conveyed no threats and maintained a conversational tone throughout the interview, permitting the Defendant's wife again to participate, and indicating a non-custodial discussion. *See Hashime*, 734 F.3d at 283 (relevant facts to the inquiry being an officer's words and "tone of voice and general demeanor").[1]

During questioning, the agents were forthcoming about why law enforcement was at the Defendant's residence. No deceit or trickery was involved, and the questioning was not prolonged or repetitive. The Defendant was not deprived of any necessities, nor verbalized any discomfort, physical or otherwise. Furthermore, the Defendant resisted and corrected what he felt were misunderstandings. These events, along with other circumstances of the interview, show that law enforcement did not coercively extract any statements, and that the Defendant's will was not "overborne" nor his "capacity for self-determination critically impaired." *See United States v. Holmes*, 670 F.3d 586, 591 (4th Cir. 2012).

---

[1] The Defendant cites to no legal authority for his claim that the "tactics" employed by the FBI with respect to the Defendant's phone meant that the text messages video-recorded by the FBI were not obtained voluntarily (ECF No. 49, at 23-24); the claim is also immaterial both because the seizure of that information was covered by the search warrant and because the text messages were subsequently produced to the government by Company 1.

The facts here are similar to those in *United States v. Stinson*, No. 17-cr-211, 2018 WL 2172510, at *4 (E.D. Va. May 9, 2018), in which the district court found that the defendant was not in custody.  In *Stinson*, the defendant was questioned in his home, not handcuffed, and the door to the room in his house was shut (but not locked or otherwise obstructed).  Two officers "calmly questioned" the defendant, with no threats being made.  *Id*.  The court also found that the defendant—as here—answered several questions in the negative, showing that he was willing and able to do so.  *Id*.  Under the totality of the circumstances, the Defendant's statements were made free from coercive police conduct and were not custodial.

## II.  <u>An Evidentiary Hearing is Not Required</u>

As the Fourth Circuit has explained, "an evidentiary hearing is not always required to resolve a motion to suppress."  *United States v. Griffin*, 811 F. App'x 815, 816 (4th Cir. 2020), citing Fed. R. Crim. P. 12(c) (reflecting that a district court "may" schedule a motion hearing to resolve a pretrial motion).  When material facts that affect the resolution of a motion to suppress evidence are in conflict, the appropriate way to resolve the conflict is by holding an evidentiary hearing to enable the district court to make findings.  But the Fourth Circuit has found no abuse of discretion in a district court's decision to rule on a motion to suppress without first conducting an evidentiary hearing where, although a defendant asserted that contested issues exist, the issues raised "were either immaterial to the court's suppression decision or were not contested at all."  *Id.* at 816-17 (internal quotation marks omitted).  Here, even assuming as true each of the facts alleged in the Defendant's motion, the circumstances did not rise to legal custody and, therefore, any contested issues are immaterial.  *See id.*  Because any dispute would be a legal and not a factual one, no evidentiary hearing is required.  *See United States v. Robinson*, 153 F. Supp. 2d 188, 191 (E.D.N.Y. 2001) ("[A] district court is not required to hold an evidentiary hearing if the

12

defendant's 'moving papers did not state sufficient facts which, if proven, would have required the granting of the relief requested.'") (quoting *United States v. Culotta*, 413 F.2d 1343, 1345 (2d Cir. 1969)).

The analysis begins with accepting as true the following allegations in the Defendant's motion with respect to the August 23, 2021 interview:[2]

- Two agents showed their FBI credentials to the Defendant and entered his home without specifically having been invited to enter.

- One of the agents banged on a window.

- It was nighttime.

- The agents directed the Defendant and his wife to sit on the living-room sofa.

- The agents sat between the Defendant and the only exit.

- The agents did not tell the Defendant that he could refuse to participate.

- The agents did not offer accommodations for the Defendant's age or health.

- The agents interrogated the Defendant for 90 minutes.

- The Defendant's wife asked the agents if he should have an attorney present.[3]

The analysis further accepts as true the following allegations with respect to the September 9, 2021 interview:

- The agents sat in chairs that "effectively" blocked the Defendant's exit from the room.

---

[2] This recitation of the facts is for purposes of argument only; as described above, the government does not believe that the Defendant's portrayal of events is entirely accurate.

[3] Even assuming that the Defendant's wife *asked* a question about counsel (or had the Defendant done so), that fact has no bearing as to factors at issue in determining whether the interview was custodial. It also would not suffice as an unequivocal invocation. *See United States v. Johnson*, 400 F.3d 187, 195 (4th Cir. 2005) (collecting cases that have found statements like "I think I need a lawyer," "Do you think I need an attorney here?," and "I think I want a lawyer" to be equivocal requests for counsel that did not require the cessation of questioning).

- One of the agents adopted a confrontational tone.

- One of the agents asked to see the Defendant's phone and "plucked" it from his hand.

- One of the agents made a comment in a perceived "sarcastic" tone and hit his hand on a table.

Taken together, these factors still did not require *Miranda* warnings, because all of these facts—indeed, more aggravating ones—were present in cases where courts in this Circuit concluded that an interview was not custodial. *See, e.g.*, *Nielsen*, 640 Fed. App'x 224 (the defendant was interviewed outside his house by three agents, for three hours, until after dark; additional agents also were present searching inside of the house, and the defendant was separated from his family; some of the questioning became aggressive, and the defendant said at the time he was suffering from PTSD from a prior accident; agents did not tell him that he was free to terminate the interview and leave; and he was thereafter placed under arrest); *United States v. Azua-Rinconada*, 914 F.3d 319, 325 (4th Cir. 2019) (the defendant was interviewed on his couch in his living room mid-morning, next to an agent, with another agent in the same room; the agents did not display weapons or use force on any person, but did say in advance of entry: "Open the door or we're going to knock it down"; they did not isolate the defendant; they never told him that he was not under arrest or free to leave and instructed him to fill out an immigration field questionnaire using "command words"; and agents arrested the defendant immediately after the interview).

By contrast, the types of cases that have triggered *Miranda* were those involving substantially different circumstances. *See, e.g.*, *Hashime*, 734 F.3d at 283-85 (finding three-hour interview of suspect in home to be custodial interrogation when the suspect was awakened at gunpoint with 15 to 30 officers present in the residence, was not permitted to move unless guarded,

14

and was isolated from his family and questioned in a small storage room); *United States v. Colonna*, 511 F.3d 431, 435-36 (4th Cir. 2007) (finding three-hour interview to be custodial interrogation when the suspect was awakened at gunpoint with 23 officers present in the residence, was guarded at all times, and was questioned in an FBI vehicle).  So, too, are other cases cited by the Defendant materially different from the facts alleged here.  *See United States v. Wilson*, No. 21-CR-00360-LKG, 2023 WL 4421572, at *5 (D. Md. July 7, 2023) (finding interview custodial where agents cut off the defendant's car as he attempted to leave his home; seven law-enforcement vehicles parked in his driveway; and approximately 20 armed agents entered the home to conduct a search, armed and wearing FBI vests); *United States v. Song*, 544 F. Supp. 3d 929, 933-34 (N.D. Cal. 2021) (finding interview custodial where nine FBI personnel arrived and six drew their weapons, with at least one pointing at the house; agents directed the defendant outside while her six-year-old daughter slept upstairs alone; and one or more agents followed the defendant inside the house and remained nearby the bedrooms' open doors while she went to check on her daughter, prompting the defendant to ask permission each time she moved).

Notably, the Defendant cites to only one instance, in the Ninth Circuit, in which a court held that an in-home interrogation was custodial where no search warrant had already been executed at the time of the interview.  *See* ECF No. 49, at 24 (citing *United States v. Tang Juan*, No. 2:20-CR-00134, 2021 WL 2212235 (E.D. Cal. June 1, 2021)).  However, that case is readily distinguishable because, unlike here, the interview in *Juan* took place in a "very small apartment" in a student-housing complex, mid-pandemic, during a time when a new tenant was actively moving in, leaving the defendant no real place of her own to retreat; the agents followed her around the apartment during the encounter; the defendant was not a U.S. citizen and, thus, when the agents took her passport, she in fact could go nowhere without it; and the defendant had no familiarity

with the American justice system so as to have felt free to terminate the questioning.  *See id.* at *3-*7.

## III.    <u>The Search Warrant Was Independently Sourced</u>

Finally, even assuming that the Defendant was in custody (which he was not) on August 23, 2021, the subsequent search-warrant affidavit relied upon consensual phone calls and other evidence detailed above to support probable cause that evidence would be found in his home. Accordingly, even a custodial encounter on August 23, 2021 would not result in the suppression of, among other things, electronic devices obtained during the lawful search.

The Defendant states that "the *only* statements in the search warrant affidavit suggesting that Dr. Wang may have evidence relevant to a search in his home" came from the first interview. ECF No. 49, at 24 (emphasis in original).  But the Defendant inaccurately cites the record on this issue—he in fact points to the *post*-August 23, 2021 phone calls alleged in the search warrant to argue that the August 23, 2021 interview improperly tainted probable cause for the search.  *See id.* at 24 (citing to paragraphs in the Weeks affidavit that post-date the August 23, 2021 interview and refer to phone calls that took place on August 24, 2021, August 30, 2021, and August 31, 2021 relating to the Defendant's use of Gmail and electronic devices); *see also id.* at 6 (arguing that the "sole bases" for a search of the Defendant's home were his August 23, 2021 statements regarding keeping data on removable storage devices and a personal computer (which were *not* made on August 23, 2021), and the documents sent in response to the grand jury subpoena).  Given that probable cause for the search warrant stemmed from sources independent of the August 23, 2021 interview, even a custodial encounter on that date would not require the suppression of statements or evidence as poisonous fruit.

## **CONCLUSION**

The Court's inquiry here is an objective one and not based upon the Defendant's (or his wife's) subjective feelings.  Any interview by law enforcement with an individual carries certain "coercive aspects" due to the heightened risk that the suspect will be arrested and charged. *Hargrove*, 625 F.3d at 178.  But none of the facts here gave rise to custody simply because the Defendant was approached by law enforcement for questioning under the circumstances, even as he has alleged them.  For the foregoing reasons, the Court should deny the motion to suppress and the request for an evidentiary hearing.

Respectfully submitted,

Glenn S. Leon
Chief, Fraud Section

By:   /s/ Andrew Tyler
Andrew Tyler
Vasanth Sridharan
Fraud Section, Criminal Division
U.S. Department of Justice
1400 New York Avenue, N.W.
Washington, D.C. 20530

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will send notice to all counsel of record.

<u>/s/ Andrew Tyler</u>
Andrew Tyler
Fraud Section, Criminal Division
U.S. Department of Justice